**Donald GIESEKING, Jeffrey Snatilli, Mark Miget, Joseph Nowotny, Cecil Hancock, Darlene Declue, Missouri Protection & Advocacy Services, Plaintiffs,**

v.

**Keith SCHAFER, Gary V. Sluyter, Otis R. Bowen, Secretary of Health & Human Services, John Ashcroft, Governor, State of Missouri, Defendants.**

No. 86–4636–CV–C–5.

United States District Court,
W.D. Missouri, C.D.

Aug. 13, 1987.

Ann B. Lever, Roger J. Bertling, St. Louis, for plaintiffs.

Mary Stewart Tansey, Joann Leykam, Jefferson City, Mo., for State defendants.

Christy Schmidt, Office of Gen. Counsel, Dept. of Health & Human Services, Kansas City, Mo., for Federal defendant.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

Before the Court are the Federal and State defendants' motion to dismiss or, in the alternative, for summary judgment as to all counts of plaintiffs' first amended complaint. For the following reasons, the Court concludes that plaintiffs' claims under the Rehabilitation Act and the due process clause must be dismissed. However, defendants' motion to dismiss as to the remaining claims must be denied.

### Factual Background

Plaintiffs bring this action individually and on behalf of other similarly situated individuals pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. Plaintiffs seek certification of a

class which consists of all handicapped persons within the State of Missouri who have been or will be determined by the Missouri Department of Mental Health ("DMH") or one of its regional centers to be developmentally disabled and for whom DMH and its regional centers have failed or will fail to develop individual habilitation/treatment plans or to secure treatment, training, placement, residential care, habilitation or other services consistent with their individual habilitation/treatment plans and comprehensive service needs. The proposed plaintiff class also includes a sub-class of developmentally disabled persons who have been or will be committed to institutions operated by DMH and for whom DMH and its regional centers have failed or will fail to secure the community group living arrangements called for by their individual habilitation/treatment plans.

Plaintiffs bring this action against the State defendants pursuant to 42 U.S.C. § 1983, alleging that the State defendants' failure to develop and implement individual habilitation plans for developmentally disabled individuals and the failure to meet their comprehensive service needs violate the Developmental Disabilities Act of 1984, 42 U.S.C. § 6000 *et seq.* (Supp.1987) ("DD Act"). The DD Act is a federal-state grant program whereby the federal government provides financial assistance to participating states to assist in creating programs to care for and treat the developmentally disabled. Additionally, plaintiffs allege that implementing individual habilitation plans and providing comprehensive services to some developmentally disabled individuals while denying them to plaintiffs and the class they seek to represent also violates section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs further allege that the Secretary of Health and Human Services has failed to perform his statutory duties to ensure compliance with the DD Act and section 504 of the Rehabilitation Act. Finally, plaintiffs contend that allowing plaintiff Donald Gieseking and his putative sub-class to remain institutionalized despite professional recommendations for community placement violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs seek both declaratory and injunctive relief and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 29 U.S.C. § 794a.

Both the Federal defendant and the State defendants have moved to dismiss or, in the alternative, for summary judgment. The Federal defendant has moved to dismiss on the following grounds:

(1) The State program referred to in plaintiffs' complaint does not receive federal funds and, thus, is not a program assisted by DD Act funds; (2) the DD Act does not create an implied right of action against the Secretary of the Department of Health and Human Services; and (3) no private cause of action exists against the Secretary under § 504 of the Rehabilitation Act.

The State defendants have moved to dismiss on the following grounds:

(1) The DD Act does not allow a private cause of action against state officials, nor does it create substantive rights to an individual habilitation/treatment plan or services; (2) plaintiffs' Rehabilitation Act claim should be dismissed because the exclusive remedy for claimed inappropriate use of DD funds is the DD Act; and (3) plaintiffs' Constitutional claims should be dismissed because there is no Constitutional right to an individual habilitation/treatment plan or to community placement.

### Program Assisted With DD Act Funds

The initial question before the Court is whether plaintiffs have properly alleged that the state program alleged in plaintiffs' complaint is a program assisted with DD Act funds. As noted by the Federal defendant, if the program does not receive federal funds under the DD Act, then the state is under no obligation to assure the Secretary that each person found to be developmentally disabled has a habilitation plan or receives appropriate services. *See Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531,

1545, 67 L.Ed.2d 694 (1981) ("Pennhurst I").

Section 123(a) of the DD Act provides that:

"The Secretary shall require as a condition to a State's receiving an allotment under this subchapter that the State provide the Secretary satisfactory assurances that each program (*including programs of any agency,* facility, or project) *which receives funds from the State's allotment* under this subchapter (1) has in effect for each developmentally disabled person who receives services from or under the program a habilitation plan meeting the requirements of subsection (b) of this section, and (2) provides for an annual review, in accordance with subsection (c) of this section of each such plan." (emphasis added)

Section 6022(b)(5)(C), in reference to the requirements of state plan approval, provides that:

"The plan must contain or be supported by assurances satisfactory to the Secretary that the human rights of all persons with developmental disabilities (especially those persons without familial protection) who are receiving treatment, services or habilitation under *programs assisted* under this part will be protected consistent with section 6009 of this title (relating to rights of the developmentally disabled)." (emphasis added)

The Federal defendant asserts that because plaintiffs did not receive services under a program assisted by DD Act funds, then plaintiffs have failed to state a claim under the DD Act upon which relief may be granted. Plaintiffs counter by arguing that plaintiffs do indeed receive habilitation services under a program assisted by DD Act funds, and that the assisted program under which they receive services is the Missouri Division of Mental Retardation and Developmental Disabilities' service delivery program, comprised of the regional centers for the developmentally disabled and the regional advisory councils on developmental disabilities. In order to answer the question of whether the program alleged in plaintiffs' complaint is a "program assisted" with DD Act funds, the Court must first analyze the Missouri scheme for the administration of services to developmentally disabled individuals.

The Missouri Department of Mental Health ("DMH") is the state agency designated to administer or supervise administration of the state plan submitted for Missouri's allotment of DD Act funds. *See* 42 U.S.C. § 6022(b)(1)(B). The Division of Mental Retardation and Developmental Disabilities is the actual grantee of Missouri's DD Act funds; it makes the application for those funds and has final decision-making authority on sub-grants of those funds. The Division of Mental Retardation and Developmental Disabilities ("Division") is, by state law, charged with the responsibility of providing services to mentally retarded and developmentally disabled clients of the DMH. Mo.Rev.Stat. § 633.010.2(1).

The Division has a service delivery system to link developmentally disabled clients with the services that they need. To ensure the accessibility of services for the developmentally disabled, the DMH has divided the state into eleven (11) regions. Mo.Rev.Stat. § 633.035. Each region has a regional council on developmental disabilities and a regional center for the developmentally disabled. *See* Mo.Rev.Stat. § 633.040, 633.100. As noted by plaintiffs, the regional councils and regional centers are the principal vehicles for the Division's service delivery system.

The regional centers are the entry or primary access points for developmentally disabled individuals into the Division's service delivery system. The regional centers evaluate whether applicants meet the developmental disability eligibility criteria. Once eligibility is determined, the client is assigned to a regional center case manager who is responsible for organizing the individual habilitation planning process for the client. Through the individual habilitation planning process, the client's service needs and least restrictive environment are identified. The case manager then links the client with appropriate services for his or her individual needs. Once the client's service needs are identified, the Division

meets those needs in two ways: (1) directly through its own facilities; or (2) by contracts with community-based providers. Regardless of whether a client's services are provided directly by the Division or are purchased from community vendors with funds allocated to each regional center, it is the regional center which coordinates those services for the individual client.

The regional councils are the other integral part of the service delivery system. It is through the regional councils that the Division's service delivery system receives DD Act funds. In fiscal year 1987, as well as in previous years, the Division is using federal DD Act monies to fund staffing grants for all eleven regional councils. Specifically, $394,805.66 in DD Act funds paid part of the salaries of the eleven regional council coordinators and secretaries as well as the operating expenses of the councils. The regional coordinators and secretaries are the permanent, day-to-day staff of the regional councils.

Under the DD Act, the state plan for fiscal year 1987 must identify three out of four "priority services" in which at least 65% of its allotment will be spent. *See* 42 U.S.C. §§ 6022(b)(4)(B)(i)(II), 6022(b)(4)(E), and 6001(11)(C). These four "priority services" are "alternative community living arrangement services, employment-related activities, child development services, and *case management services.*" (emphasis added) 6001(11)(C). The Division chose case management, child development and employment related activities as its three priorities. Under the DD Act, "case management services" are defined as:

"... such services to persons with developmental disabilities as will *assist them* in gaining access to needed social, medical, educational and other services. Such term includes—

(i) follow-along services to ensure, through a continuing relationship, lifelong if necessary, *between an agency or provider* and a person with a developmental disability and the person's immediate relatives or guardians that the changing needs of the person and the

family are recognized and appropriately met, and

(ii) *coordination services* which provide to persons with developmental disabilities support, access to (and coordination of) other services, information on programs and services, and monitoring of the person's progress." (emphasis added).

The staffing grants for the regional councils are funded as "case management services."

As part of the case management services which they provide with federal DD Act funds, the regional councils, in conjunction with the regional centers, prepare annual plans for the regions. Those plans include: (1) an inventory of existing residential facilities, day programs and specialized services for the mentally retarded and developmentally disabled; (2) an assessment of needs, including any special target populations, of unserved or underserved, or inappropriately serviced persons; and (3) a statement of specific goals for the region. *See* Mo.Rev. Stat. § 633.045.1. The specific service goals and priorities for services established in the regional plans are used by the regional centers to request funding for expanded services in their areas.

In addition to shaping the budget for services to regional center clients, the regional councils provide client-directed services in other ways. The regional councils must "review and advise on programs and policies of the regional centers." Mo.Rev. Stat. § 633.051. They may also consider the appropriate use of existing agencies and personnel providing residential, day programming or other specialized services and advise the regional centers on methods of operation to assure comprehensive services for the developmentally disabled in their region. *See* Mo.Rev.Stat. § 633.050.2.

Plaintiffs argue that because of the mutually dependent roles of the regional centers and regional councils in case management, budget planning, policy development, service prioritizing, and service expansion, DD Act funding for the regional councils constitute DD Act assistance to the Division of Mental Retardation and Develop-

mental Disabilities' service delivery program. In support of this contention, plaintiffs note that they receive services under this service delivery program and have received evaluation and diagnostic services from the regional centers. Plaintiffs further state that it is through the regional centers that they also receive such services as case management, counseling and vocational training. Thus, plaintiffs argue that since it is the service delivery program of the Division which has failed to develop and implement individual habilitation plans for plaintiffs and which has failed to secure for plaintiffs the other services appropriate to their needs, and since that program receives DD Act assistance in the form of staffing and operating grants for the regional councils, then the Division's service delivery program is a program assisted by DD Act funds.

The Federal defendant counters by quoting from relevant portions of the DD Act legislative history, noting that Congress requires habilitation plans "only when the Federal assistance under this Act contributes a portion of the cost of the habilitation services to the developmentally disabled persons." H. Conf.Rep. No. 94–473, 1975 U.S. Code Cong. Admin.News 919, 963. The Federal defendant states that the role of the regional councils is to advise and review policies and programs, not to provide direct services. In addition, the Secretary argues that the funds budgeted to the regional councils for case management are for salaries, fringe benefits, staff travel, office and communication expenses, and planning; thus, funding to the regional councils does not provide any portion of the cost of habilitation services.

The Court finds the Federal defendant's argument that no DD Act funds are used for habilitation services unpersuasive. As noted by plaintiffs, through case management, the Division's service delivery program links developmentally disabled individuals with the habilitation services appropriate to their needs. Those case manage-

ment services are provided by both the regional centers and the regional councils. Additionally, federal DD Act funds pay part of the salaries of the eleven regional coordinators (some of whom are regional council members) and secretaries, as well as the operating expenses of the councils. Additionally, under Missouri's DD Act grant, the regional councils are funded as "case management services"—services to developmentally disabled individuals that will assist them in gaining access to needed social, medical, educational, and *other services*—rather than as administrative activities. *See* 42 U.S.C. § 6001(11)(H). Furthermore, as noted by plaintiffs, the state defendants' own officials testified, by way of deposition, that the regional councils provide case management services through their coordination activities, insuring that services are provided to developmentally disabled individuals, and by providing advice for and review of the service delivery functions carried out by the regional centers. *See* Conklin Dep. p. 36, lines 23–25; Conboy Dep. p. 25, lines 11–19.

■ Therefore, the Court concludes that since federal DD Act funds support, at least indirectly, the Division of Mental Retardation and Developmental Disabilities' service delivery program—which is administered by the regional center and the regional council through case management—and since that program provides coordination services which provide developmentally disabled individuals support and access to other services (including habilitation services), then the program is one assisted by DD Act funds.

### Private Right of Action Under the Developmental Disabilities Act

The next question for the Court is whether plaintiffs have a private cause of action under § 122(b)(5)(B) and § 123 of the Developmental Disabilities Act of 1984, 42 U.S.C. § 6000 *et seq*, ("DD Act") or a cause of action under 42 U.S.C. § 1983.[1] How-

---

**1.** 42 U.S.C. § 1983 provides that:
"Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State of Territory, subjects, or causes to be

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges and laws, shall be liable to the party injured in an

ever, before undertaking this monumental task, the Court must first take a brief look at the general structure and analyze the overall purposes of the Act.

To begin with, the DD Act itself establishes a federal-state grant program whereby the Federal Government provides financial assistance to participating states to assist them in creating programs to care for and treat the developmentally disabled. As with other federal-state cooperative programs, the Act is voluntary, and states are given the choice of complying with the conditions set forth in the Act or foregoing the benefits of federal funding. *See Pennhurst I*, 451 U.S. at 13, 101 S.Ct. at 1537.

The Act begins with a list of Congressional findings and an exhaustive statement of purposes. 42 U.S.C. § 6000(a) and (b). The "overall purpose" of the Act is:

"... to assist States to (A) assure that persons with developmental disabilities receive the care, treatment, and other services necessary to enable them to achieve their maximum potential through increased independence, productivity, and integration into the community, and (B) establish and operate a system which coordinates, monitors, plans, and evaluates services which ensures the protection of the legal and human rights of persons with developmental disabilities." 42 U.S.C. § 6000(b)

Section 121, as a preface to Subchapter II of the Act, provides that

"[t]he purpose of this subchapter is to provide payments to States to plan for, and to conduct, activities which will increase and support the independence, productivity, and integration into the community of persons with developmental disabilities."

The Act also lists a variety of conditions for the receipt of federal funds. Under § 109, for example, the Secretary, "[a]s a condition of providing assistance" shall require that "each recipient of such assistance take affirmative action to employ and advance in employment qualified handicapped individuals ..." Another condition

to receipt of funds under the Act is the submission of a state plan which must be approved by the Secretary. § 6022(a). Section 6022(b)(5) provides that "[t]he plan must provide that services are provided in an individualized manner consistent with the requirements of section 6023 of this title (relating to habilitation plans)." A further condition, which is the crux of plaintiffs' claim under the DD Act, is that "[t]he Secretary shall require as a condition to a State's receiving an allotment under this subchapter that the State provide the Secretary satisfactory assurances that each program (including programs of any agency, facility, or project) which receives funds from the State's allotment under this subchapter (1) has in effect for each developmentally disabled person who receives services from or under the program a habilitation plan...." § 6023(a). Finally, a further condition is that "the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities...." § 6042.

The Act also provides procedures and sanctions to ensure state compliance with its requirements. First, the Secretary may disapprove a state plan. § 6022(b). If a State fails to comply with the requirements of § 6022 (requirements for a state plan), the Secretary "*shall* make no further payments to the State ... or shall limit further payment ... to activities in which there is no such failure." § 6027. Any state that is dissatisfied with the Secretary's disapproval of a plan, or with his decision to terminate or limit funding, may appeal to the federal courts of appeals. § 6029. No other cause of action is expressly recognized in the Act.

The thrust of plaintiffs' argument is that the development and implementation of individual habilitation plans is a condition to the receipt of DD Act funds for the State of Missouri, and that plaintiffs have a substantive right to enforce Missouri's obligation either by way of a private cause of action under § 122(b)(5)(B) and § 123 of the DD Act, or by bringing an action under 42 U.S.C. § 1983 to enforce these provisions.

action at law, suit in equity, or other proper proceeding for redress."

For their cause of action against the Secretary of Health and Human Services, plaintiffs argue that under the DD Act, the Secretary is required to limit or terminate funding for substantial noncompliance with any of the express conditions of the Act; thus, the Act creates a mandatory duty on the Secretary to monitor Missouri's service delivery program and to ensure compliance —a duty which plaintiffs claim to have a private right of action to enforce.

### Cause of action against State defendants

Preliminarily, it is worth repeating that the DD Act contains no express provision authorizing an aggrieved handicapped individual to institute a court action for the purpose of enforcing its provision. Thus, if plaintiffs are to pursue this claim, it must first be determined that they are entitled to an implied private right of action under the DD Act or, alternatively, a private right of action under Section 1983. *See Ryans v. New Jersey Commissioner for the Blind and Visually Impaired,* 542 F.Supp. 841, 844 (D.N.J.1982). In answering the question of whether plaintiffs have a private cause of action against the state defendants, the Court is aided somewhat by recent Supreme Court decisions.

In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed. 555 (1980), the Supreme Court squarely held that section 1983, in accordance with its literal language, broadly encompasses violations of federal statutory law, as well as constitutional law. *Id.* at 3, 100 S.Ct. at 2504. Applying this holding, the Supreme Court permitted an AFDC beneficiary to sue state officials under section 1983 to compel their compliance with the Federal Social Security Act, 42 U.S.C. § 602(a)(7), even though Congress had created no private right of action itself to enforce the provision in question. *Id.*

■ Since *Thiboutot,* the Supreme Court has created two exceptions to the general rule that section 1983 is available for enforcement of federal statutory rights against state officials. A section 1983 action is not available if:

(1) the federal statute in question creates no enforceable "rights"; or

(2) Congress has created exclusive remedies for the enforcement of the statute which explicitly or implicitly preclude any other form of action. *Middlesex County Sewage Authority v. National Sea Clammers Asso.,* 453 U.S. 1, 19, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981); *Pennhurst I,* 451 U.S. at 28, 101 S.Ct. at 1545. In general, there is a presumption that a federal statute creating enforceable rights may be enforced in a section 1983 action, and it is the defendants' burden to show that Congress has withdrawn the Section 1983 remedy. *See Boatowners and Tenants Association v. Port of Seattle,* 716 F.2d 669, 674 (9th Cir.1983); *Valdez v. Grover,* 563 F.Supp. 129, 132 (W.D.Wis.1983).

As to the question of whether there is a section 1983 action based on alleged violations of the DD Act, the Supreme Court's most recent pronouncement is in *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("Pennhurst I"). In *Pennhurst I,* mentally retarded residents of a Pennsylvania hospital for the care and treatment of the mentally retarded brought suit under the DD Act challenging conditions of confinement. More specifically, the action was brought under the "Bill of Rights" provision of the Act, 42 U.S.C. §§ 6010(1) and (2) [recodified at 42 U.S.C. §§ 6009(1) and (2)], which states that developmentally disabled persons "have a right to appropriate treatment, services, and habilitation" in "the setting that is least restrictive of personal liberty." The Court of Appeals for the Third Circuit, in affirming the District Court, held that the "Bill of Rights" provision of the Act created substantive rights in favor of developmentally disabled individuals and imposed an obligation on the states to provide, at their own expense, "appropriate treatment" in the "least restrictive" environment. *Id.* at 8–9, 101 S.Ct. at 1535–1536.

The Supreme Court reversed the Court of Appeals by holding that section 6010 of the DD Act, rather than creating substantive entitlements, did no more than express

a Congressional preference for certain kinds of treatment. *Id.* at 19, 101 S.Ct. 1541. The Court's conclusion that the section 6010 "Bill of Rights" provisions were "hortatory, not mandatory" was based primarily on the absence of language specifying compliance as a condition for the grant of federal funds. The Court rejected the contention that § 6010, as part of legislation passed pursuant to Congress' spending power, creates substantive rights imposed upon the states as a condition to receiving federal funds. The Court likened legislation passed pursuant to the spending power to a contract—in return for funds, states must agree to comply with federally-imposed conditions. *Id.* at 16, 101 S.Ct. at 1540. The Court noted, however, that these conditions must be explicitly and unambiguously set forth in order for substantive rights to be created. *Id.*

The Supreme Court's decision did not, however, preclude the possibility of statutory liability arising from violations of other sections of the Act. On the contrary, the Court specifically noted that other provisions of the Act which do expressly condition the receipt of federal funds on compliance, such as §§ 6022(b)(5)(B) and 6023, could give rise to a section 1983 or an implied right of action under the Act, and the Court remanded the case specifically for the purpose of having the lower court make that determination.[2] 451 U.S. at 28, 101 S.Ct. 1545. In dicta, the Court further noted that the plaintiffs' relief could well be limited to enjoining the Federal Government from provided funds to the State of Pennsylvania. *Id.* at 29, 101 S.Ct. 1546. Thus, this Court must address the question never resolved by the Supreme Court in *Pennhurst I*—whether § 6022(b)(5)(B) (requiring assurances in the plan that services are provided in an individualized manner) and § 6023(a) (which requires assurances in the plan that each developmentally disabled person has in effect an individual habilitation plan) create substantive rights in plaintiffs and, if so, whether these rights are enforceable against the State of Missouri by way of an implied private right of action under the DD Act or a section 1983 cause of action.[3]

On this point, the State defendants first argue that courts have held that the DD Act does not create substantive rights to an individual habilitation plan or to services in an individualized manner consistent with that plan. These defendants argue that the primary purpose of the Act is to "assist" and financially "support" various activities of the state in providing comprehensive services to developmentally disabled individuals.

Second, the State defendants argue that even if the DD Act does create substantive rights in favor of plaintiffs, plaintiffs' exclusive remedy under the DD Act is against the Secretary of Health and Human Services only after the Secretary had

---

**2.** *See e.g. Society for Good Will to Retarded Children v. Cuomo,* 572 F.Supp. 1300, 1349 (E.D. N.Y.1983) (*Pennhurst I* decision did not preclude the possibility of statutory liability arising from violations of other sections of the DD Act); *William S. v. Gill,* 536 F.Supp. 505, at 510–11 (N.D.Ill.1982) (finding *Pennhurst I* inapplicable because provision in the Education for all Handicapped Children's Act of a free appropriate education is an express condition for receipt of funds).

**3.** The Supreme Court in *Pennhurst I* remanded this case to the Third Circuit Court of Appeals to address the federal constitutional claims, plaintiffs' claims under the Pennsylvania statute, and plaintiffs' claims under Section 504 of the Rehabilitation Act of 1973.

On remand, the Third Circuit again affirmed the district court, holding that the Pennsylvania Mental Health/Mental Retardation Act of 1966, 50 Pa.Stat.Ann. §§ 4101–4704, granted Pennsyl-

vania's retarded citizens the right to adequate habilitation in the least restrictive environment. 673 F.2d 647 (3d Cir.1982) (en banc).

The Supreme Court again granted certiorari and again reversed and remanded the judgment of the Third Circuit, holding that the Eleventh Amendment barred a federal court from ordering prospective injunctive relief against state officials on the basis of violations of state law, even where the state law claims were properly brought into the federal court under pendent jurisdiction. *Halderman v. Pennhurst State School and Hospital,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*"Pennhurst II"*).

After eleven years of litigation, the parties eventually settled this case, with the Supreme Court never again presented with the question of whether other provisions of the DD Act created substantive rights. *See* 610 F.Supp. 1221 (D.C.Pa.1985).

made the decision that the state had failed to substantially comply with the provisions of the Act. On this second point, the State defendants rely chiefly on *Garrity v. Gallen*, 522 F.Supp. 171 (D.N.H.1981).

In *Garrity*, residents of a New Hampshire school for the mentally retarded brought a class action against numerous state officials including the Governor of New Hampshire, the State Commissioner of the Department of Health and Welfare, and the Director of the Division of Mental Health. Plaintiff sought a ruling by the trial court to the effect that their right to habilitation requires that it be effected in the least restrictive alternative, i.e. by way of community placement. *Id.* at 176. The United States was granted leave to intervene as a party plaintiff.

The Court in *Garrity* held that pursuant to the DD Act, plaintiff would have an implied private right of action against the Secretary of Health and Human Services for the purpose of compelling him to perform his mandatory statutory duties. *Id.* at 202. In so holding, the Court engaged in an extensive analysis of the role of the Secretary of Health and Human Services in monitoring the implementation of state plans and the system of agency enforcement by which Congress established in the DD Act. *Id.* The Court's conclusion was that plaintiff had a private right of action under the DD Act itself to ensure that the Secretary performs his mandatory duties under the statute. *Id.*

However, the Court in *Garrity*, relying on limitations established for the Court's

*Thiboutot* decision, concluded that this implied right of action against the Secretary to compel compliance was the plaintiffs' exclusive remedy and that the State defendants could not be sued under section 1983. *Id.* at 203. The Court reasoned that: "[t]he implication of this limited private right of action is consistent with the DD Act and further its purposes, whereas permitting action against the state or its employees pursuant to 42 U.S.C. § 1983 would serve only to undermine the carefully formulated regulatory scheme created under this federal-state cooperative program." *Id.*[4]

■ After a careful and painstaking analysis of the DD Act, the cases interpreting it since *Pennhurst I* and similar funding statutes, the Court concludes that Congress clearly intended to create enforceable "rights" for developmentally disabled individuals in § 122(b)(5)(B) and § 123 of the DD Act, and that the State defendants have not shown that Congress intended to preclude enforcement of these rights by way of a section 1983 action. Furthermore, while the Court agrees with the District Court in *Garrity* that a private right of action against the Secretary is warranted under the DD Act (see *infra* page 1262), the Court is unpersuaded that this remedy is the exclusive remedy for the alleged violation by a state of the expressed "conditions" to the receipt of federal funds set forth in the DD Act.

We begin by taking a look at the two DD Act provisions themselves. Section

---

**4.** The Court went further and noted what it deemed to be several policy reasons as to why the Secretary, and not the states, should be answerable under the DD Act. First, the Court noted that: "[i]t would be anomalous indeed for this Court to enjoin the State of New Hampshire to comply with a federal-state grant program administered by the Secretary when the Secretary himself has already deemed—either explicitly or implicitly by approval of the state plan and the forwarding of funds to the state—that the State is in compliance. In the event that the Secretary has failed to comply with the statutory duties, then the Secretary should be made to defend his actions (or inactions) in court." *Id.* Second, the Court noted that it was unwilling to "save the Secretary from the 'pain of decisionmaking' by allowing him to shift the

battle to federal court and to have it waged against the states in a § 1983 action." *Id.* According to the Court, "the more a court exercises the power entrusted to administrative agencies, 'the more we encourage the responsible public officials to default in their obligations.'" (citation omitted) *Id.* Finally, the court in *Garrity* reasoned, in distinguishing its case from the Supreme Court's decision to allow section 1983 relief under the Social Security Act in *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), that, "[t]he judicial task of resolving whether a particular state statute is at loggerheads with a federal statute is far more manageable than reviewing whether a state is in 'substantial' compliance with a federal-state cooperative program, the enforcement of which is entrusted to the Secretary." *Id.*

6022(b)(5)(B), in reference to the contents of the State plan, provides that, "[t]he plan must provide that services are provided in an individualized manner consistent with the requirements of section 6023 of this title (relating to habilitation plans)." Section 6023(a) (condition for receipt of state allotment) provides that:

"The Secretary *shall require as a condition* to a State's receiving an allotment under this subchapter that the State provide the Secretary satisfactory assurances that each program (including programs of any agency, facility, or project) which receives funds from the State's allotment under this subchapter (1) has *in effect* for each developmentally disabled person who receives services from or under the program a habilitation plan meeting the requirements of subsection (b) of this section, and (2) provides for an annual review, in accordance with subsection (c) of this section, of each such plan." (emphasis added)

In *Pennhurst I,* the Supreme Court drew a distinction between sections of the DD Act which Congress clearly intended to impose conditions on the grant of federal funds and the "Bill of Rights" section which it concluded did not intend to impose such conditions. The *Pennhurst I* Court emphasized the importance of this distinction:

"... legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly ac-

cepts the terms of the 'contract.' [citations omitted] There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. [citations omitted] By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." 451 U.S. at 17, 101 S.Ct. at 1540.

Sections 6022(b)(5)(B) and 6023(a), unlike the "Bill of Rights" provisions in which the *Pennhurst I* Court held did not create substantive rights, expressly condition the receipt of federal funds on compliance with their requirements. Under § 6022(b)(5)(B), the state plan, which must be submitted and approved by the Secretary before DD Act funds will be allotted, *must* contain assurances that services are provided in an individualized manner. Likewise, § 6023(a) conditions the receipt of DD Act funds on the assurance that: (1) each developmentally disabled individual has a written habilitation plan; and (2) this individual habilitation plan be *in effect.* Thus, as to these expressed conditions, there can be no question that a state accepting funds under the DD Act should be fully aware of the requirement that each individual qualifying for assistance under the program has an individual habilitation plan in effect and that the implementation of that plan be done in an individualized manner.[5]

However, before plaintiffs can, under the Court's holding in *Thiboutot,* assert a

---

**5.** The Court is not persuaded by defendants' argument that the statutory requirement to provide assurances does not require the Secretary to probe beyond the data submitted by the states and that such assurances should be considered satisfactory. *See, e.g. American Hospital Asso. v. Schweiker,* 721 F.2d 170, 178 (7th Cir.1983) (Congress, in enacting Hills–Burton Act "strongly intended" that the words of statutory assurances be given a practical reality, with the result being that persons covered under the Act receive the assured services.) *Wilder v. City of New York,* 568 F.Supp. 1132, 1136 (E.D.N.Y. 1983) ("Although the statute [Section 408(f) of

the Social Security Act, 42 U.S.C. § 608(f) ] does not explicitly require the implementation of that plan, it would be capricious to suppose that Congress did not expect at least an attempt to do so.") *See also Board of Education of the Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 200, 102 S.Ct. 3034, 3048, 73 L.Ed.2d 690 (1982) ("It would do little good for Congress to spend millions of dollars [through the Education for all Handicapped Children's Act] providing access to public education only to have the handicapped child receive no benefit from that education.")

cause of action under section 1983 for Missouri's alleged violation of these expressed conditions in the DD Act, the Act itself must create a "right, privilege or immunity" within the meaning of section 1983. *See Jensen v. Conrad,* 570 F.Supp. 91, 111 (D.S.C.1983). The Court finds evidence that Congress did intend to create such a right in the DD Act itself.

The express purposes of the Act, as set forth in §§ 6000(a) and (b) and § 6021, are to assure that developmentally disabled individuals receive the necessary care and services that will enable them to become more independent and more fully integrated members of society. In order to achieve this overall purpose, Congress set up this funding statute to assist the States in achieving these overall objectives. Rather than stopping at merely providing states with assistance for habilitation services and treatment consistent with these goals, Congress went one step further and expressly required states, as a condition for funding, to have "in effect a system to protect and advocate the rights of persons with developmental disabilities ..." § 6042(a)(1). This system, in addition to being independent of the agency providing treatment, services or habilitation to developmentally disabled individuals, must "have the authority to pursue *legal,* administrative, and other appropriate remedies to ensure the protection of the rights of such persons who are receiving treatment, services, or habilitation with the State...." (emphasis added) § 6042(a)(2)(A); § 6042(a)(2)(C).

As noted by Justice White, in reference to this system of protection and advocacy of the rights of the developmentally dis-

abled, "it seems rather plain that the Act contemplates not only ongoing oversight by the Secretary but also enforcement of the rights of persons receiving treatment through judicial action or otherwise." *Pennhurst I,* 451 U.S. at 50, 101 S.Ct. at 1556 (Justice White dissenting). *See also Rosado v. Wyman,* 397 U.S. 397, 422–423, 90 S.Ct. 1207, 1222–1223, 25 L.Ed.2d 442 (1970) ("It is ... particularly part of the duty of this tribunal, no less in the welfare field that [sic] in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress attached to their use.")

Therefore, having found nothing contrary in the DD Act itself nor in the authority cited by the State defendants, the Court concludes that Congress, at least as to expressed conditions to the receipt of federal funds in § 6022(b)(5)(B) and § 6023(a), intended to create enforceable "rights" in developmentally disabled individuals, and that these rights can be enforced by way of a cause of action under section 1983.[6]

Additionally, the Court is unpersuaded by the State defendants, in their reliance on *Garrity,* that plaintiffs' exclusive remedy lies against the Secretary of Health and Human Services. In *Garrity,* the District Court concluded that permitting an action against state officials under section 1983 would "serve only to undermine the carefully formulated regulatory scheme created under this federal-state cooperative program." 522 F.Supp. at 203. This Court disagrees.

---

**6.** It should be noted that this section 1983 cause of action against the state official is limited to a twofold inquiry by the District Court. The first step is for the Court to determine whether the state has complied with the procedures set forth in the DD Act. This inquiry will require the Court not only to satisfy itself that the state has adopted the state plan, policies and assurances required by the Act, but also to determine whether the state has created an individual habilitation plan for each plaintiff in question which conforms with the requirements of § 6023(b).

Second, the Court must determine whether the individual habilitation plan developed

through the Act's procedures is reasonably calculated to enable that individual to receive the individual habilitation services set forth within the plan.

If these requirements have been met, the state has complied with the obligations imposed by Congress, and the Court can require no more. Thus, once the Court determines that the requirements of the DD Act have been met, questions of methodology are for resolution by the State of Missouri and not this federal Court. *See e.g. Board of Education of the Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 206–207, 102 S.Ct. 3034, 3051, 73 L.Ed. 2d 690 (1982).

In *Middlesex County Sewerage Authority v. National Sea Clammers,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Supreme Court based its holding—that the enforcement mechanisms in the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.,* and the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. § 1401 *et seq.,* constituted the exclusive remedies under these acts—primarily on the fact that the "unusually elaborate enforcement provisions" in the two acts demonstrated that Congress did not intend to authorize additional judicial remedies. 453 U.S. at 13, 101 S.Ct. at 2623. Unlike these two acts, the DD Act does not provide any enforcement provision for private parties.

As noted earlier, in determining the exclusivity question, the Court must presume that a section 1983 right of action exists unless there is evidence in the underlying statute which suggest an intent on the part of Congress to foreclose such an action. *See Ryans v. New Jersey Commission for the Blind, etc.,* 542 F.Supp. 841, 848 (D.N. J.1982).[7] Contrary to the District Court in *Garrity,* this Court can find no evidence in the DD Act of a Congressional intention to withdraw any section 1983 relief against a state where such relief would otherwise be available.[8]

### Cause of Action Against the Federal Defendants

Having concluded that plaintiffs have a section 1983 action against the State defendants, the Court must determine whether plaintiffs also have a private cause of action against the Secretary of Health and Human Services to compel him to either terminate or reduce federal funding because of the DMH's alleged failure to develop and implement individual habilitation plans as required in § 6022(b)(5)(B) and § 6023(a). On this point, the Court finds *Garrity* more persuasive.

In *Garrity,* the District Court concluded that the plaintiffs had an implied private right of action against the Secretary of Health and Human Services for the limited purpose of compelling him to perform his mandatory statutory duties. 522 F.Supp. at 202. In determining that plaintiffs had an implied private right of action under the DD Act, the *Garrity* court relied on one of four factors set forth by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In *Cort,* the Supreme Court noted that in determining whether a private remedy is implicit in a statute not expressly providing for one a court is to consider the following: (1) Is the plaintiff one of the class for whose especial benefit the statute was enacted, i.e., does the statute create a federal right in favor of plaintiff? (2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? (3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? (4) Is the cause of action one traditionally regulated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? 422 U.S. at 78, 95 S.Ct. at 2088.

In *Garrity,* the Court, after noting the purpose of the Act as outlined in various provisions of the DD Act, relied chiefly on the first *Cort* factor and concluded that "... even though the states are the primary and direct beneficiaries of federal funds under the Act, it is clear that devel-

---

7. As noted by plaintiffs, the Supreme Court has consistently held that it will "'not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federally secured right." *Wright v. City of Roanoke,* —— U.S. ——, ——, 107 S.Ct. 766, 771, 93 L.Ed.2d 781 (1987) quoting *Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3469, 82 L.Ed.2d 746. *See also Boatowners and Tenants Association v. Port of Seattle,* 716 F.2d 669, 674 (9th Cir.1983) ("... in the absence of such evidence that the Congress intended that the statute provide the exclusive remedy, the plaintiff who establishes the existence of an enforceable right will be free to proceed under § 1983.")

8. Since the Court has found that plaintiffs have a section 1983 cause of action against the state defendants, the Court need not answer the question of whether there is an implied private right of action under the DD Act itself against State defendants.

opmentally disabled persons derive benefits from the statute," and thus, are "among 'the class for whose especial benefit the statute was enacted.'" 522 F.Supp. at 201. The Court in *Garrity*, however, indicated that this private right of action is very narrow by noting that: "the right enjoyed by the plaintiffs is a limited one, which does not even come into existence unless and until the state decides to accept funds from the federal government. At the point of such acceptance, it can be implied from the Act that a developmentally disabled person has a limited right to assure that the Secretary of Health and Human Services performs his statutory duty in enforcing the Act." 522 F.Supp. at 201. One such statutory duty that the Court concluded that plaintiffs had a right to enforce by way of this "limited" private right of action was contained in § 6065 (recodified at § 6027), which provides that the Secretary must limit or terminate a state's funding if he finds that "there is a failure to comply substantially with any of the provisions of section [6022] of this title to be included in the State plan." *Id.*

■ Despite the Federal defendant's criticism of the *Garrity* decision (based primarily on the fact that the Secretary of Health and Human Services was not a party defendant), this Court finds *Garrity* persuasive, and concludes that plaintiffs have a limited private right of action under the DD Act against the Secretary of Health and Human Services to compel him to perform his mandatory duties under the Act, which include limiting or terminating federal funds for a state's failure to comply with expressed conditions in the DD Act.

### Plaintiffs' claim under Section 504 of the Rehabilitation Act

Both the Federal and State defendants have moved to dismiss, or in the alternative, for summary judgment, as to plaintiffs' claim under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Section 504 provides, in pertinent part, that:

"[N]o otherwise qualified handicapped individual in the United States, as defined in Section 706(7) of this title, shall, *solely by reason of his handicap,* be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance...." (emphasis added) 29 U.S.C. § 794.

In support of his motion to dismiss plaintiffs' claims under the Rehabilitation Act, the Secretary alleges that: (1) plaintiffs have not shown that they were not discriminated "solely by reason of his handicap"; and (2) no § 504 Rehabilitation Act claim exists against a federal funding agency. The State defendants argue that these Rehabilitation Act claims should be dismissed because: (1) No Rehabilitation Act claim exists against the State defendants because a private cause of action under the DD Act against the Secretary is plaintiffs' exclusive remedy; (2) plaintiffs have failed to allege that they are "otherwise qualified" as that term is used in the Act; and (3) plaintiffs have failed to specifically allege a program or activity receiving federal funds.

■ For the following reasons, the Court concludes that plaintiffs' section 504 claim must be dismissed since plaintiffs have failed to demonstrate that they were discriminated against "solely by reason of" their handicap. Thus, the Court need not address these other issues raised by defendants.

■ To begin with, in order to state a cause of action under section 504, plaintiffs must allege that: (1) they are handicapped within the meaning of the Act; (2) they "otherwise qualified" for the services sought; (3) they were excluded from services solely by reason of their handicap; and (4) the program in question receives federal financial assistance. *Plummer by Plummer v. Branstad,* 731 F.2d 574, 577 (8th Cir.1984); *Doe v. New York University,* 666 F.2d 761, 775 (2d Cir.1981). The requirement that poses the most considerable problem for plaintiffs is the requirement that plaintiffs be denied some benefit "solely by reason" of their handicap.

Plaintiffs' second cause of action, as set forth in their first amended complaint, reads as follows:

"53. Defendants Schafer, Sluyter, and Ashcroft have discriminated against the individual plaintiffs and the class they represent by refusing, solely on the basis of their handicap, to have individualized habilitation/treatment plans in effect for them or to secure services consistent with those plans and their comprehensive service needs, in violation of the Rehabilitation Act, 29 U.S.C. § 794 and its implementing regulations.

54. Defendant Bowen has failed to monitor DMH or to order remedial action, including the termination or limitation of federal financial assistance, against DMH despite the refusal of defendants Schafer, Sluyter, and Ashcroft to have individual habilitation/treatment plans in effect for the individual plaintiffs and the class they represent or to secure services consistent with such plans and their comprehensive based solely on their handicap, in violation of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations."

Thus, the essence of plaintiffs' allegations is that they are handicapped, are not receiving services that other handicapped individuals are receiving through DMH, and, thus, are being denied these benefits vis-a-vis other handicapped individuals "solely" because of their handicaps. The Court agrees with defendants that plaintiffs' complaint is defective and has failed to adequately allege a section 504 claim.

As noted by defendants, the proposed plaintiffs class seeks individual habilitation plans and other services, not in spite of their handicaps, but because of their handicaps. In other words, the fact that plaintiffs are handicapped is the very reason that they are entitled to such services. While the case law and regulations support the proposition that a section 504 cause of action may lie where plaintiffs assert discrimination between classes of handicapped persons, see Doe v. Coluatti, 592 F.2d 704 (3rd Cir.1979) and 45 C.F.R. § 84.4(b)(1)(iv), plaintiffs' complaint is defective in that it does not state that they were denied these services because of some distinction between their handicaps and the handicaps of other developmentally disabled individuals who have received individual habilitation plans and appropriate treatment. See Clark v. Cohen, 613 F.Supp. 684, 693 (D.C. Pa.1985) (Plaintiff failed to state section 504 claim where she failed to allege that she was denied community living arrangement because her mental retardation was more (or less) severe than other mentally retarded individuals); see also Phillips v. Thompson, 715 F.2d 365, 368 (7th Cir. 1983); Flowers v. Webb, 575 F.Supp. 1450, 1456 (E.D.N.Y.1983). Without alleging some distinction between their handicaps and the handicaps of other developmentally disabled persons receiving appropriate services and treatment through DMH, plaintiffs' complaint does not properly allege that plaintiffs were discriminated "solely" because of their handicaps, and, thus, plaintiffs' second cause of action must be dismissed.

### Plaintiffs' Equal Protection Claim

Plaintiffs' third cause of action alleges that the State defendants have denied them and the proposed class they represent, equal protection of the laws by refusing, without a rational basis, to have individual habilitation plans in effect or to secure services consistent with those plans, all in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The State defendants have moved to dismiss plaintiffs' equal protection claim, alleging that since the state has a rational basis for prioritizing the limited resources of the DMH, then plaintiffs' third cause of action must fail. Based on the reasons set forth below, the State defendants' motion to dismiss plaintiffs' third cause of action must be denied.

Preliminarily, it should be noted that the Equal Protection Clause of the Fourteenth Amendment requires that similarly situated individuals should be treated similarly. Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed. 786 (1982). Social and economic legislation that does not employ suspect classifications or im-

pinge upon fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose. *Hodel v. Indiana,* 452 U.S. 314, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981). As noted by the State defendants, such legislation carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality. *Id.* When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern. *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed. 2d 870, on remand 475 F.Supp. 109 (1979), *aff'd* 445 U.S. 901, 100 S.Ct. 1075, 63 L.Ed. 2d 317 (1980). Thus, if a classification has some "rational basis," it does not offend the Constitution simply because the classification results in some inequality. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

In their motion to dismiss, the State defendants allege that there are a number of rational and reasonable bases for prioritizing DMH's limited resources. The State defendants note, as an example, that priority is given to those developmentally disabled individuals who present a danger to themselves or to others. These defendants also note that DMH's regional centers have also given priority to preschool-aged clients because the Department of Education will offer services to school-aged children, but not preschoolers. Thus, the State defendants argue that because of the limited resources of the State and the priorities established by DMH, some clients receive the full complement of services while others, who receive some services, must wait for all the services commensurate to their needs.

In opposition to the State defendants' motion to dismiss, plaintiffs argue that the Missouri statutes cited by the State defendants are legally insufficient to provide a rational basis for plaintiffs' differential treatment because these statutes neither identify the classifying criteria used to determine their differential treatment of plaintiff nor the articulated governmental purpose served by such treatment. Additionally, plaintiffs argue that the State defendants have not identified the classifying criteria used to distinguish those developmentally disabled individuals who are to receive individual habilitation plans and comprehensive services from those who do not.

In reference to the State defendants' lack of a classifying criteria, plaintiffs list a number of possible situations in which the Court could find that this classification does not have a rational basis. Plaintiffs note that if the State defendants, in fact, have no real criteria, then obviously the differential treatment is arbitrary and unconstitutional. If they have criteria but those criteria are not applied consistently, then the differential treatment is arbitrary and unconstitutional. Finally, plaintiffs argue that if the State defendants have criteria but those criteria are not rationally related to a legitimate governmental purpose, then the differential treatment violates the Equal Protection Clause.

Rule 56(c) of the Fed.R.Civ.Pro. provides that summary judgment may only be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See e.g. Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir.1983); *Ralph's v. AMF,* 667 F.2d 670, 672 (8th Cir.1981). The Court concludes that the question of whether the State defendants have a rational basis for providing some individual habilitation plans and services for some developmentally disabled individuals while denying those benefits to persons like plaintiffs is a question of fact which cannot be decided until after a full-fledged trial on this issue. Thus, the State defendants' motion for summary judgment as to plaintiffs' equal protection claim must be overruled.

### Plaintiffs' Substantive Due Process Claim

Plaintiffs' fourth cause of action alleges that the State defendants have denied plaintiff Gieseking, and the proposed subclass that he represents, due process of the

law by failing to provide them reasonable care and safety, freedom from undue restraint, and necessary training or habilitation, all in violation of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983. More specifically, plaintiff Gieseking alleges that in about 1967, plaintiff Gieseking was involuntarily committed as a mentally ill person to Farmington State Hospital. Subsequently, in 1982, the DMH Division of Comprehensive Psychiatric Services determined that plaintiff Gieseking was not mentally ill or disordered. As a result, plaintiff Gieseking was referred to the Division of Mental Retardation and Developmental Disabilities' St. Louis Regional Center for evaluation as a developmentally disabled person. The regional center evaluated him and found him eligible for developmental disability services. Plaintiff Gieseking asserts that the individual treatment plan prepared by DMH professionals at St. Louis State Hospital found that he was ready for discharge to a community placement; but despite this professional judgment that he was ready for community placement, plaintiff Gieseking remains institutionalized. Thus, plaintiff Gieseking argues that he and the class that he represents have a substantive right to community placement when that placement is part of the appropriate treatment prescribed for them by their treating or examining professional, and the failure to so place plaintiff Gieseking is a violation of due process.

In arguing that he has a substantive right to community placement after professional recommendation, plaintiff Gieseking relies primarily on the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and lower court decisions interpreting *Youngberg.* In *Youngberg,* the mother of a mentally retarded individual, who was involuntarily committed to a Pennsylvania state institution, brought a section 1983 action against the institutional officials, claiming that her son had constitutional rights to safe conditions of confinement, freedom from bodily restraint, and training or "habilitation" for his mental retardation. The question presented before the Supreme

Court was whether a mentally retarded individual involuntarily committed to a state institution for the mentally retarded had substantive rights under the Due Process Clause of the Fourteenth Amendment to: (1) safe conditions of confinement; (2) freedom from bodily restraints; and (3) training or habilitation. *Id.* at 309, 102 S.Ct. at 2454.

In reference to plaintiff's claim that he had a constitutional right to minimally adequate habilitation, the Supreme Court held that plaintiff's due process liberty interests require a state to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint. *Id.* at 319, 102 S.Ct. at 2460. In so holding, the Court noted that, "the minimally adequate training required by the Constitution is such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints. In determining what is 'reasonable'—in this and in any case presenting a claim for training by a State—we emphasize that courts must show deference to the judgment exercised by a qualified professional." *Id.* at 322, 102 S.Ct. at 2461.

■ However, plaintiff Gieseking concedes that the plaintiff in *Youngberg* was involuntarily committed in a state institution for the mentally retarded, and the Supreme Court did not decide the question of whether individuals voluntarily committed to state institutions have the same right to a minimal level of habilitation and training. Also undecided by the *Youngberg* court is the particular question before this Court, i.e., whether the failure to place plaintiff in community placement, a least restrictive environment, after professional recommendation by a DMH professional that he be so placed, violates plaintiff Gieseking's due process liberty interests such that this Court can compel the state to place plaintiff Gieseking in an appropriate community living arrangment. For the following reasons, the Court concludes that plaintiff Gieseking's due process liberty interests are not violated by the DMH's failure to place plaintiff Gieseking in community placement, even if this less restrictive

alternative is recommended by DMH professionals.

To begin with, it is worth re-emphasizing that plaintiff Gieseking, unlike the plaintiff in *Youngberg,* is not an individual involuntarily confined by the state within state facilities. As stated in plaintiffs' first amended complaint, plaintiff Gieseking's individual treatment plan provides that he is ready for discharge, but he remains institutionalized while he awaits placement in an appropriate community group living arrangement. Thus, this case does not fall within the constitutional minimum standard of habilitation established in *Youngberg,* which related, not to the qualitative betterment of a retarded person's life, but only to the training necessary to afford the individual safety and freedom from bodily restraint.

Furthermore, the courts have uniformly rejected the notion that mentally retarded and developmentally disabled individuals have a constitutionally-founded right to receive treatment in the least restrictive alternative. *See Lelsz v. Kavanagh,* 807 F.2d 1243, 1249 (5th Cir.1987); *Rennie v. Klein,* 720 F.2d 266, (3rd Cir.1983); *Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239, 1248 (2d Cir.1984); *Phillips v. Thompson,* 715 F.2d 365, 368 (7th Cir.1983).

Plaintiff Gieseking, however, asks the Court to find such a federal constitutional right to community placement based on the fact that DMH professionals have recommended such placement. Plaintiff relies on a number of cases as authority for this federal constitutional right. The Court, however, is unpersuaded by these cases that his federal constitutional due process rights have been violated.

In *Lelsz v. Kavanagh,* 807 F.2d 1243 (5th Cir.1987), plaintiffs filed a class action against officials of the Texas Department of Mental Health and Mental Retardation, alleging widespread abuses of mentally retarded patients and advocating their habilitation in the "least restrictive alternative" setting as a minimum standard of care. The action culminated into a consent decree between the state defendants and the class which was approved by the district court. The Fifth Circuit Court of Appeals vacated the judgment of the district court approving the consent decree by concluding that because any right plaintiffs had to community placement would have originated in state law rather than federal law, the Eleventh Amendment precluded suit by plaintiffs in federal court. *See Pennhurst II,* 465 U.S. at 121, 104 S.Ct. at 919. In analyzing the question of whether, in addition to the state right to community placement, there was a concurrent federal constitutional right, the Court noted that:

> "It is also worthwhile to observe that should the optimum standard of habilitation afforded class members by state law become coextensive with federal constitutional requirements, the emphasis of *Youngberg* on the judgment of the State's professionals will be thoroughly undermined. The constitutional standard in that instance would be determined by the views of expert witnesses, and outside consultants could effectively overrule state programs, contrary to *Youngberg.* While *Youngberg* may eventually have to be squared with the duty of a state to prevent deterioration of skills of the retarded committed to its institutions … this is by no means the same as requiring the State to provide the best care possible or the optimum location to improve the client's physical, mental and emotional conditions."

*Id.* at 1251.

Thus, *Lelsz* does not appear to be of any help to plaintiff Gieseking.

Plaintiff Gieseking also relies on *Clark v. Cohen,* 794 F.2d 79 (3rd Cir.1986). In *Clark,* the Third Circuit Court of Appeals entered an order directing the state to develop a program of community services for a mildly retarded individual who had been confined to an institution for 28 years without the benefit of procedural due process. This case is distinguishable from the instant case in that the Third Circuit Court of Appeals was "dealing with a plaintiff who was (involuntarily) committed without notice or hearing as a result of a petition containing an incorrect diagnosis, and who

was retained against her will without a hearing for 28 years." *Id.* at 86. Thus, the Court of Appeals concluded that plaintiff's involuntary confinement for such a long period of time deprived plaintiff of community living that she could have received, in violation of her due process liberty interests. Thus, *Clark* was "an individual case where the *only* method to remedy the effect of the unconstitutional confinement was community placement." *Lelsz,* 807 F.2d at 1250, n. 9.

Finally, plaintiff Gieseking relies on *Thomas S. v. Morrow,* 781 F.2d 367 (4th Cir.1986), to justify his argument that the failure to place him in a community placement, as recommended, violates his due process liberty interests. In *Thomas S.,* plaintiff, a young incompetent adult who had been a ward of the State of North Carolina from birth, brought a section 1983 action against the state alleging that his confinement in a host of different facilities violated his right to due process. More specifically, plaintiff protested the defendants' failure to provide minimally adequate treatment, alleging that his institutionalization imposed a degree of restraint on his liberty that was inconsistent with professional judgment concerning his appropriate treatment. *Id.* at 373. Plaintiff requested an injunction ordering the defendants to place him in an appropriate group home and to provide other treatment recommended by the professionals who had examined and worked with him. *Id.* The Fourth Circuit held that the district court did not err in finding that in this particular case, the failure to place plaintiff, a ward of the state, in a group home in the community violated plaintiff's liberty interests in safety and freedom from undue restraint. The Court was very careful, however, in limiting its holding to the particular case before the Court:

> "In *Society for Goodwill* the district court's order that 400 mentally retarded patients be placed in the community by 1987 was reversed. In *Phillips* the district court's refusal to place a class of several hundred mentally retarded adults in the community was affirmed. Thus, these decisions do not apply to the facts

in Thomas's case in which a discrete recommendation for treatment was made by qualified professionals to meet the needs of *an individual* ..." (emphasis added) *Thomas S.,* 781 F.2d at 376.

Thus, the holding in *Thomas S.* dealt with an individual situation that was limited to the particular facts before the Court and does not stand for the broad proposition that the failure to place a voluntarily confined individual in a community placement, after professional recommendation for such placement, is a violation of a plaintiff's due process liberty interest as established in *Youngberg. See Society for Good Will,* 737 F.2d at 1250. ("Where the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no constitutional obligation to grant.") Thus, neither the cases cited by plaintiff Gieseking nor plaintiff's view of those cases persuades the Court that a federal constitutional right to community placement exists where the DMH fails to so place an individual after professional recommendation for such placement.

Accordingly, it is hereby

ORDERED that plaintiffs' second and fourth cause of action are dismissed. It is further

ORDERED that the state and federal defendants' motions to dismiss or, in the alternative, for summary judgment as to the plaintiffs' remaining causes of action are denied.